Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com

Attorneys for Plaintiff

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| GINGER M., individually and on behalf of A.M. a minor, <br><br> Plaintiff, <br><br> vs. <br><br> AETNA LIFE INSURANCE COMPANY, <br><br> Defendant. | COMPLAINT |

Plaintiff Ginger M. ("Ginger") individually and on behalf of A.M. a minor, through her undersigned counsel, complains and alleges against Defendant Aetna Life Insurance Company ("Aetna") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Ginger and A.M. are natural persons residing in Ventura County, California. Ginger is A.M.'s mother.

1

2. Aetna was the insurer and claims administrator, as well as the fiduciary under ERISA for the insurance plan providing coverage for the Plaintiff ("the Plan") during the treatment at issue in this case.

3. The Plan is a fully insured employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). Ginger was a participant in the Plan and A.M. was a beneficiary of the Plan at all relevant times. Ginger and A.M. continue to be participants and beneficiaries of the Plan.

4. A.M. received medical care and treatment at Triumph Youth Services ("Triumph") beginning on March 22, 2022. Triumph is a licensed treatment facility located in Box Elder County Utah, which provides sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

5. Aetna denied claims for payment of A.M.'s medical expenses in connection with his treatment at Triumph.

6. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

7. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because Aetna does business in Utah, and the treatment at issue took place in Utah.

8. In addition, the Plaintiff has been informed and reasonably believes that litigating the case outside of Utah will likely lead to substantially increased litigation costs she will be responsible to pay and that would not be incurred if venue of the case remains in Utah. Finally, given the sensitive nature of the medical treatment at issue, it is the Plaintiff's

desire that the case be resolved in the State of Utah where it is more likely both her and A.M.'s privacy will be preserved.

9. The remedies the Plaintiff seeks under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendant's violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### Triumph

10. A.M. was admitted to Triumph on March 22, 2022, due to issues which included substance use, defiance, violent altercations resulting in police involvement, running away from home, depression, feelings of worthlessness, and suicidal ideation.

11. In a letter dated March 25, 2022, Aetna denied payment for A.M.'s treatment. The letter was signed only by "Aetna" and gave the following justification for the denial:

> We reviewed information received about the member's condition and circumstances and the member's benefit plan, We are denying coverage for Residential Mental Health treatment. The following specific out-of-network Residential Treatment Center criteria or provisions were not met: Is credentialed by Aetna or is accredited by one of the following agencies, commissions or committees for the services being provided: The Joint Commission (TJC); The Committee on Accreditation of Rehabilitation Facilities (CARF); The American Osteopathic Association's Healthcare Facilities Accreditation Program (HFAP); The Council on Accreditation (COA). In addition to the above requirement, the medical director must be a psychiatrist. Therefore, Residential Mental Health treatment is not covered under the terms of the plan.

12. On September 14, 2022, Ginger submitted an appeal of the denial of payment of A.M.'s treatment at Triumph. Ginger reminded the reviewer that she was entitled to certain

protections under ERISA during the review process, including a full, fair, and thorough review conducted by appropriately qualified reviewers whose identities were clearly disclosed, which gave her the specific reasons for the adverse determination, referenced the specific plan provisions on which the determination was based, and which gave her the information necessary to perfect the claim.

13. She asked that the reviewer be knowledgeable about generally accepted standards and clinical best practices for residential treatment programs in the State of Utah, and that they be trained in the details of MHPAEA to respond to her allegations concerning a violation of the statute.

14. She reminded Aetna that it had an obligation to act in her best interest. She contended that coverage for Triumph was available under the terms of the Plan and that Triumph was duly licensed by the State of Utah and compliant with governing state regulations.

15. Ginger argued that the denial of payment for A.M.'s treatment at Triumph was a violation of MHPAEA. She wrote that MHPAEA compelled insurers to provide benefits for behavioral health services at parity with benefits for analogous medical or surgical services in the same classification. She identified skilled nursing, subacute rehabilitation, and inpatient hospice facilities as some of the medical or surgical analogues to the treatment A.M. received.

16. Ginger contended that Aetna was imposing limitations based on "facility type or other criteria" to limit the availability of residential treatment care. She noted that while Aetna required many intermediate level facilities to be licensed, for residential treatment centers it also required a specific national accreditation, credentialing with Aetna, and a medical director with a specific specialty.

17. She wrote that Aetna did not appear to impose any of these requirements on skilled nursing, rehabilitation, habilitation, or hospice facilities, and contended that this disparate treatment between mental health and medical or surgical care constituted a violation of MHPAEA. She voiced her concern that Aetna was in violation of California state parity law in this manner as well.

18. She requested that Aetna perform a MHPAEA compliance analysis of the Plan and asked to be provided with physical copies of the results of this analysis. She asked Aetna to include information which detailed the development, implementation, and evidentiary standards, concerning the non-quantitative treatment limitations she had identified, including how these applied (or did not apply), to analogous medical or surgical benefits in the same classification as the residential treatment A.M. received.

19. In addition Ginger asked to be provided with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits she was seeking, any administrative service agreements that existed, any clinical guidelines or medical necessity criteria utilized in the determination (along with their medical or surgical equivalents, whether or not these were used), together with any reports or opinions regarding the claim from any physician or other professional, along with their names, qualifications, and denial rates (collectively the "Plan Documents").

20. In a letter dated October 14, 2022, Aetna upheld the denial of payment for the denial of payment for A.M.'s treatment at Triumph. The letter stated in pertinent part:

> After our review, we have determined the claim in question processed correctly per your plan benefits. The services rendered require authorization prior to being rendered. Our records show that precertification was not obtained. We are upholding the denial as administrative. Since the administrative denial is based on

the health plan's provisions, a medical necessity review will not be conducted. Therefore, no additional payment will be made with respect to the above listed claim.

21. In the event precertification is not obtained, the summary plan description states that "there may be a penalty" and directs the reader to the schedule of benefits. The penalty is defined in the schedule of benefits as: (emphasis in original)

> Failure to **precertify** your **eligible health services** when required will result in the following penalty:
> - A $400 penalty will be applied separately to each type of **eligible health services** (the penalty will never exceed the cost of the benefit)

22. The Plaintiff exhausted her pre-litigation appeal obligations under the terms of the Plan and ERISA.

23. The denial of benefits for A.M.'s treatment was a breach of contract and caused Ginger to incur medical expenses that should have been paid by the Plan in an amount totaling over $150,000.

24. Aetna failed to produce a copy of the Plan Documents including any medical necessity criteria for mental health and substance use disorder treatment and for skilled nursing or rehabilitation facilities despite Ginger's request. Aetna also failed to produce any documentation concerning its lack of MHPAEA compliance.

## FIRST CAUSE OF ACTION

**(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))**

25. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Aetna, acting as agent of the Plan, to discharge its duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

//

6

26. Aetna and the Plan failed to provide coverage for A.M.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

27. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and engage in a meaningful dialogue with plaintiffs in the pre-litigation process.

28. The denial letters produced by Aetna do little to elucidate whether Aetna conducted a meaningful analysis of the Plaintiff's appeals or whether it provided her with the "full and fair review" to which she is entitled. Aetna failed to substantively respond to the issues presented in Ginger's appeals and did not meaningfully address the arguments or concerns that the Plaintiff raised during the appeals process.

29. In fact, Aetna's denial letters rely on formulaic recitations and do not address the arguments raised by Ginger in any capacity.

30. In addition, Aetna revised its justification for the denial of payment to a lack of precertification, without explaining how any such action allowed it to deny payment in totality, rather than imposing a $400 penalty. It appears that once the reviewer determined that a denial for lack of precertification would be issued, they declined to engage with Plaintiff's appeal any further.

31. Aetna and the agents of the Plan breached their fiduciary duties to A.M. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in A.M.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of A.M.'s claims.

32. The actions of Aetna and the Plan in failing to provide coverage for A.M.'s medically necessary treatment are a violation of the terms of the Plan and its facility eligibility criteria.

33. While the presentation of alternative or potentially inconsistent claims in the manner that Plaintiffs state in their first and second causes of action is specifically anticipated and allowed under F.R.Civ.P. 8, Plaintiffs contend they are entitled to relief and appropriate remedies under each cause of action.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))

34. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of Aetna's fiduciary duties.

35. MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

36. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

37. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a

lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

38. The facility eligibility criteria used by Aetna for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the facility eligibility criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

39. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for A.M.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

40. When Aetna and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

41. Aetna and the Plan evaluated A.M.'s mental health claims using facility eligibility criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

42. Plaintiff identified numerous disparities in the requirements Aetna imposed on A.M.'s residential treatment compared to analogous medical or surgical care, including a specific national accreditation, credentialing with Aetna, and a medical director with a specific specialty.

43. On information and belief, Aetna does not impose such requirements on analogous medical or surgical services. Plaintiff requested documentation to further verify this, and asked Aetna to perform its own assessment, but Aetna ignored both requests.

44. The Plan purports to rely on generally accepted standards of medical practice when it evaluates the medical necessity of covered benefits. Generally accepted standards of medical practice for residential treatment centers include policies such as regular meetings with a mental health professional and evidence-based treatment interventions.

45. Triumph is a licensed treatment facility and provides treatment in a manner that complies with generally accepted standards of medical practice.

46. Generally accepted standards of medical practice are largely codified and enforced by the appropriate licensing, regulatory, and accreditation entities. In the case of residential treatment for mental health and substance use disorders, no licensing, regulatory, or accreditation entities impose requirements such as 24-hour onsite nursing services as part of generally accepted standards of care.

47. Through its imposition of requirements which are stricter than those dictated by generally accepted standards of care as reflected in the licensing, regulatory, and accreditation entity requirements, Aetna violates MHPAEA.

48. Aetna violates MHPAEA because it relies on generally accepted standards of care and the standards of licensing, regulatory, and accreditation entities to develop its medical necessity guidelines for intermediate level medical or surgical facilities but holds residential treatment to a stricter standard beyond what is advised and considered appropriate by the relevant licensing, regulatory, and accreditation entities.

49. A parity violation can occur in this manner even when the terms at issue are facially neutral, such as when the plan documents require 24/7 onsite nursing care for both sub-acute inpatient mental health and medical/surgical facilities.

50. The MHPAEA violation occurs because 24/7 onsite nursing care is often part of generally accepted standards of care for intermediate level inpatient medical and surgical treatment but does not fall within generally accepted standards of care and is neither expected nor required for residential treatment facilities.

51. In this manner, the effect of imposing a requirement such as a facially neutral 24/7 onsite nursing requirement on residential treatment centers as well as on analogous level of care inpatient treatment facilities for medical and surgical care is to significantly limit access to coverage for intermediate level mental health and substance use disorder treatment compared to coverage for intermediate level medical and surgical treatment in a way that violates MHPAEA.

52. Aetna's policies place its insureds in the unenviable position of delaying treatment until an appropriate facility is found, all the while disregarding the medical opinions of their child's treatment team and placing their child's wellbeing in serious jeopardy, or putting their child in the treatment environment they require but running the risk that Aetna will not pay due to an absence of 24 hour onsite nurses.

53. In this manner, the Defendant violates 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and Aetna, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and

more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

54. Aetna and the Plan did not produce the documents the Plaintiff requested to evaluate medical necessity and MHPAEA compliance, nor did they address in any substantive capacity the Plaintiff's allegations that Aetna and the Plan were not in compliance with MHPAEA.

55. In fact, despite Ginger's request that Aetna and the Plan conduct a parity compliance analysis and despite the direction from the Department of Labor that ERISA plan and claim administrators perform parity compliance analyses, Aetna and the Plan have not provided Ginger with any information about whether they have carried out any parity compliance analysis and, to the extent that any such analysis was performed, Aetna and the Plan have not provided Ginger with any information about the results of this analysis.

56. The violations of MHPAEA by Aetna and the Plan are breaches of fiduciary duty and give the Plaintiff the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

    (a) A declaration that the actions of the Defendant violate MHPAEA;

    (b) An injunction ordering the Defendant to cease violating MHPAEA and requiring compliance with the statute;

    (c) An order requiring the reformation of the terms of the Plan and the criteria utilized by the Defendant to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

    (d) An order requiring disgorgement of funds obtained by or retained by the Defendant as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendant of the funds wrongly withheld from participants and beneficiaries of the Plan as a result of the Defendant's violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendant to provide payment to the Plaintiff as make-whole relief for her loss;

(g) An order equitably estopping the Defendant from denying the Plaintiff's claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendant to the Plaintiff for her loss arising out of the Defendant's violation of MHPAEA.

57. In addition, Plaintiff is entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiff seeks relief as follows:

1. Judgment in the total amount that is owed for A.M.'s medically necessary treatment at Triumph under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2. Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiff's Second Cause of Action;

//

//

//

//

//

3. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

4. For such further relief as the Court deems just and proper.

DATED this 29th day of February, 2024.

                                             By    s/ Brian S. King
                                                           Brian S. King
                                                           Attorney for Plaintiff

County of Plaintiff's Residence:
Ventura County, California